# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

## CASE NO.

TODD NEPOLA,

     Plaintiff,

v.

BRAVO MEDIA LLC;
NBCUNIVERSAL MEDIA, LLC;
and PURVEYORS OF POP
PRODUCTIONS, INC.;

     Defendant.

_____/

## VERIFIED COMPLAINT

Plaintiff, TODD NEPOLA ("Plaintiff" or 'Mr. Nepola"),  hereby sues Defendants, BRAVO MEDIA LLC ("Bravo"), NBCUNIVERSAL MEDIA, LLC ("NBCU"), and PURVEYORS OF POP PRODUCTIONS, INC., ("PPP") collectively, ("Defendants") for (I) Defamation and (II) Violation of Florida Statutes, § 540.08(1) (Unauthorized Publication of Name or Likeness), and alleges as follows:

## INTRODUCTION

1.     By now, even the most casual consumer of American popular culture is aware that the term "Reality TV" is a misnomer. As is now commonly confirmed by participants and producers alike, "It's 100% manipulated."[1] As one editor of a reality show explained last year, "Editors have been instructed for years to feed you counterfeit drama to keep you watching so the networks could get more money from advertisers - so network executives could show more profits

---

[1]     https://www.vice.com/en/article/theres-100-manipulation-the-inner-workings-of-reality-tv-according-to-a-producer/

and give themselves higher salaries."[2]

2.     Unfortunately, while this "counterfeit drama" may help network executives generate higher salaries and reward shareholders with higher stock prices, there are real people, whose lives are too often derisively referred to as "reality television fodder," who are actually impacted, manipulated, and defamed in the process. Mr. Nepola is one such person.

3.     Unlike traditional scripted television or news reporting, reality television presents and portrays the individual participants as themselves—not as fictional characters or dramatized versions thereof. In shows such as *The Real Housewives of Miami*, the viewing public is led to believe that the events, character portrayals, and interpersonal dynamics are reflective of the cast members' real lives. This perception is deliberately cultivated by the producers and networks (including Defendants Bravo, NBCU, and PPP), who carefully edit and construct storylines to create maximum dramatic impact while maintaining the illusion of authenticity.

4.     As a result, defamatory statements or implications—such as those falsely portraying the Plaintiff as financially irresponsible or suffering from financial distress—are perceived by viewers as factual and are subsequently treated as such across social media, fan forums, and related platforms. Reality television fandom, unlike typical media audiences, is highly interactive, self-organizing, and prolific. Fans create and operate blogs, Reddit communities, TikTok channels, YouTube commentary videos, Instagram fan accounts, and long-running podcasts that focus almost exclusively on dissecting and amplifying storylines and perceived "truths" about the cast members.

5.     *The Real Housewives of Miami* ("RHOM"), which is produced by PPP and airs on the NBCU-owned channel Bravo, just concluded its seventh season. RHOM is an installment of

---

2          https://www.huffpost.com/entry/reality-tv-show-problem_n_66d75086e4b09a3ee66ca635

NBCU/Bravo's massively successful "Real Housewives" franchise, which over 20 years has spawned 27 spin-off series, thousands of episodes, and millions of hours of drama, some real, most manufactured.

6.      RHOM purports to document the "real" personal and professional lives of a group of affluent women who live in and around Miami, Florida.

7.      Mr. Nepola's ex-wife, Alexia Nepola (nee Echevarria) ("Alexia"), has been a featured member of RHOM since its inception in 2011.

8.      Nevertheless, RHOM has continued to intentionally and maliciously air defamatory statements about Mr. Nepola, misuse his name and likeness, and damage his reputation in the Miami business community.

9.      PPP, Bravo and NBCU have demonstrated that they will twist and distort the truth and manipulate the show's story lines, regardless of the path of destruction they leave behind, as long as the content makes for "good television".

10.      The defamatory narrative initiated on the show triggered a wave of commentary across these platforms, resulting in thousands of public statements, comments, and ongoing discussions that falsely reinforce and exacerbate the original defamatory message. The producers and network fully understood this dynamic, having fostered and monetized it over multiple seasons and franchises. Thus, the harm suffered by Plaintiff is not limited to the initial broadcast but includes an ongoing reputational injury, emotional distress, and economic harm caused by the widespread online amplification -a foreseeable consequence of the show's design and marketing.

11.      To be clear, these statements have real implications. RHOM is a popular program with a wide global audience, extensive media coverage, and Bravo, NBCU and PPP have knowingly caused and/or permitted members of RHOM to make false, defamatory statements

3

about Mr. Nepola's financial position and then aired these distortions of fact and reality resulting in damage to Mr. Nepola's personal and professional life and reputation.

12.     Unlike isolated instances of defamation in traditional media—such as a single article, news broadcast, or scripted television episode—reality television operates on a serial format that compounds reputational harm over time. In *The Real Housewives of Miami*, the Plaintiff is not treated as a one-time subject of commentary, but as a recurring cast member, portrayed through intentionally edited and manufactured storylines season after season. This results in the typecasting of the Plaintiff into a fixed persona—one that is persistently reinforced regardless of truth or real-life developments.

13.     In Plaintiff's case, a narrative suggesting financial irresponsibility or instability was introduced and repeatedly emphasized by Defendants, despite its falsity. This false characterization was not limited to a single episode or season. Rather, once established, it became the dominant lens through which Plaintiff was portrayed, with producers actively shaping scenes, editing conversations out of context, and encouraging cast members to amplify that narrative on-camera.

14.     This practice, common in reality television, exploits the public's belief that what they are watching is a genuine reflection of real life. Defendants cannot plausibly deny responsibility for the public reaction when they are the architects of the storyline. While producers may argue that they cannot control how the public perceives a character, this is a false and disingenuous defense. The very nature of reality television relies on producer-driven manipulation of reality, including selective editing, manufactured conflict, and the deliberate construction of emotionally charged narratives designed to provoke audience response.

15.     Defendants knew or should have known that portraying the Plaintiff in a negative

4

light—particularly in connection with financial integrity—would not only impact the show's fictional narrative, but would damage Plaintiff's real-life reputation, business opportunities, and personal relationships. Furthermore, producers and networks monetize this reputational harm by leveraging public reaction to boost ratings, attract advertisers, and fuel ongoing media coverage, fan discourse, and digital engagement.

16.     Therefore, the harm caused to Plaintiff is not accidental, incidental, or isolated. It is systemic, repeated, and central to the business model of Defendants, who bear full responsibility for the foreseeable and lasting consequences of their defamatory portrayals.

17.     The harm caused to the Plaintiff is not limited to a single instance of defamation or a single episode of *The Real Housewives of Miami*. Rather, Defendants have continuously rebroadcast and republished the defamatory narrative through a variety of channels—including reruns, streaming platforms, promotional clips, aftershows, and social media campaigns—with full awareness of the resulting damage to Plaintiff's reputation.

18.     The defamatory content has been aired and re-aired across multiple platforms, including traditional cable, on-demand streaming via Peacock and other services, and official Bravo or NBCUniversal social media accounts. Each broadcast serves to reignite and revalidate the false narrative, reinforcing the public's belief in its accuracy and renewing the emotional and reputational harm to the Plaintiff.

19.     In addition, Defendants have not passively allowed the storyline to linger; they have actively fueled it through ongoing content production. This includes reunion episodes, aftershows such as Watch What Happens Live, promotional interviews, cast blogs, and social media interactions that reference and perpetuate the same false statements. These mechanisms are intentionally designed to keep the audience engaged in the drama, regardless of the truth or the

4937-9035-6845, v. 1

damage inflicted upon the Plaintiff.

20.     This pattern of conduct reveals that the subject defamation is a deliberate, calculated component of the show's business model, where character-based narratives are extended over multiple seasons and leveraged across media channels to drive viewership and profit. By keeping the defamatory narrative alive season after season, Defendants have ensured that the harm to Plaintiff is not only prolonged but escalated.

21.     Such ongoing exposure, combined with the inherently viral nature of reality television fandom, creates a never-ending cycle of reputational injury, emotional distress, and professional harm, all of which are foreseeable and avoidable consequences of Defendants' conduct.

22.     As mentioned, the defamatory portrayal of the Plaintiff is not confined to a single broadcast or episode, nor is the harm it causes limited to the initial airing. *The Real Housewives of Miami*, produced and distributed by Defendants, runs new weekly episodes during active seasons, but the content is continuously and widely available across numerous platforms year-round. This pattern creates a situation where the defamatory material is effectively republished every time a new viewer streams an episode, every time Bravo re-airs it, or every time a promotional clip is shared. As such, the reputational harm to the Plaintiff is not a one-time event—it is active, ongoing, and constantly renewed by Defendants' actions. This continuous and deliberate publication of false statements constitutes a pattern of injurious conduct, not a single incident.

23.     Defendants have failed to take any remedial action to correct or retract the falsehoods, despite the fact that they remain indefinitely accessible to the public. The damage to Plaintiff's reputation, livelihood, and emotional well-being is therefore not time-limited, but perpetuated by design.

4937-9035-6845, v. 1

24.     Defendants are fully aware of the legal and ethical risks inherent in their reality television productions. To shield themselves, they routinely require cast members to sign highly restrictive and one-sided contracts that grant producers broad discretion to edit, reframe, and manipulate footage for dramatic effect, often at the expense of truth and fairness.

25.     However, no such contract was signed by Plaintiff for Seasons 6 or 7 of *The Real Housewives of Miami*. Plaintiff did not authorize the use of his image, name, likeness, or personal narrative for any purpose during those seasons. Accordingly, Defendants had no legal or contractual right to air footage involving Plaintiff or to use Plaintiff as part of any storyline— particularly one that falsely portrayed Plaintiff in a defamatory light.

26.     Even in prior seasons where a contract may have existed, no agreement permitted or excused the fabrication or intentional distortion of facts. There was no clause authorizing the Defendants to knowingly broadcast false or misleading content, nor any provision that would permit the deliberate dissemination of defamatory narratives designed to harm the Plaintiff's reputation.

27.     Defendants' reliance on such exploitative contracts to justify reckless or malicious behavior is not only unethical, but legally insufficient where no valid agreement exists or where the conduct at issue exceeds the scope of any contractual permission. In this case, the continued use of Plaintiff's image, likeness, and personal storylines in Seasons 6 and 7 constitutes unauthorized use, invasion of privacy, and a clear violation of Plaintiff's rights under common law and applicable state and federal statutes.

28.     Defendants aired content involving the Plaintiff without consent, without compensation, and in a way that willfully harmed Plaintiff's reputation—all while having full knowledge that no enforceable contract or release authorized such conduct.

29.     This must end, and Bravo, NBCU, and PPP shall be held accountable.

## PARTIES, JURISDICTION AND VENUE

30.     Mr. Nepola is, and at all times mentioned was, an individual residing in Miami-Dade County, Florida and is otherwise *sui juris*.

31.     Bravo is limited liability company organized and existing under the laws of the State of New York, with its principal place of business located in New York, New York.

32.     NBCU is limited liability company organized and existing under the laws of the State of New York, with its principal place of business located in New York, New York.

33.     PPP is a corporation organized and existing under the laws of the State of California, with its principal place of business in Woodland Hills, CA.

34.     The jurisdiction of this Court is invoked pursuant to 28 U.S.C § 1332(a)(1), as the claims in controversy exceed the sum of $75,000 and are between citizens of different states.

35.     Defendants are subject to Florida statutory liability pursuant to Section 48.193(1), Florida Statutes, because Defendants committed tortious acts within Florida, and caused injury to persons in Florida, as set forth more fully in this Complaint.

36.     While committing tortious acts against Plaintiffs, Defendant transmitted telephonic, electronic, and written communications into Florida, and the causes of action brought against Defendant arise from those communications, as set forth more fully in this Complaint.

37.     Venue is appropriate for this action in the Southern District of Florida pursuant to 28 U.S.C. § 1391(a)(2), as the causes of action alleged herein accrued in Miami-Dade County, Florida.

38.     To the extent any events occurred outside of the state of Florida, these actions were the continuation of a tort transitory in nature originally arising in Miami-Dade County, Florida,

were the direct result of wire communications being sent into Florida or had the most significant impact in Florida.

39.     All conditions precedent to maintaining this action, if any, have been performed, waived, or excused.

## GENERAL ALLEGATIONS

### I.      The Rise of "Reality" Television and the Rebirth of Bravo.

40.     While television programs purporting to document "real," unscripted life are almost as old as the medium itself, the birth of the 21st-century craze is commonly traced back to the CBS program "Survivor," which debuted in 2000, and featured thirteen "castaways" competing on a deserted island for a $1,000,000 prize.

41.     With the massive success of "Survivor," many other television networks began to cash in on the public's desire to watch "real" people in "unscripted" situations. Many sub-genres began to emerge: voyeurism shows ("Big Brother"); competition shows ("American Idol" and "The X Factor"); celebrity life ("The Osbournes," and "Keeping up with the Kardashians"); and countless others.

42.     Bravo originally launched as a cable channel in 1980. In its early years, most of its programming consisted of international, classic, and independent films. NBCU bought the network in 2002 and used it, among other things, as a way to air syndicated reruns of hit NBC shows.

43.     In 2006, Bravo launched a new genre of reality tv shows that centered around the lives of a few married women in California. The Real Housewives franchise was born with the release of The Real Housewives of Orange County.

### II.     The Reality Behind the "Real Housewives"

44.     The show's title was not subtle: ABC, in 2004, had debuted "Desperate

9

Housewives," the first successful network primetime soap opera in decades. Bravo's executives took notice of the public's appetite for soap operas, combined it with their insatiable appetite for more "reality" television, and created a new archetype: the reality soap opera.

45.     Bravo was not shy about the show's inspiration or what the new show was going to be about. When announcing the show, Lauren Zalaznick, Bravo's president was clear that the show would be "exploring the complicated daily lives of five privileged women and their families," adding, "viewers have been riveted by the fictionalized versions of such lifestyles on television. Now, here is a series that depicts real-life 'desperate' housewives with an authentic look at their compelling day-to-day drama."[3]

46.     "The Real Housewives of Orange County" was an instant, overwhelming success. Bravo, seeking to capitalize on the success of the Real Housewives original, soon launched its second installment, "The Real Housewives of New York City," and many others soon followed. The idea was simple: replicate the soap opera reality format with new women in new cities, and trust the viewing public's appetite will grow, not shrink.

47.     The plan worked. At present, there are at least 27 "Real Housewives" spin-offs, airing in over a dozen countries. NBCU's streaming platform, Peacock, has taken in $300 million solely from past "Real Housewives" content.[4] Executives at Bravo, NBU, PPP and other production companies, have successfully leveraged the "Real Housewives" brand to generate revenue, shareholder value, viewer loyalty and significant success.

48.     But, unlike most Hollywood movie/tv success stories, this one comes with a significant cost: specifically, to the participants. As far back as 2013, there were reports that

---

3 https://www.realitytvworld.com/news/bravo-the-real-housewives-of-orange-county-premiere-march-21-3897.php
4 https://collider.com/real-housewives-earns-300-million-for-peacock/

lawyers and managers in Hollywood were telling clients to steer clear of the series because of inaccurate and damaging portrayals.[5]

49.     In the broader landscape of reality television, it was becoming increasingly clear that these shows were not accurately depicting "reality." As Emily Nussbaum, the Pulitzer-Prize winning media writer who authored a book on the history of modern reality TV explains, "there's a range of experiences, including some extremely traumatic experiences of being misrepresented and traumatized."[6]

50.     The "Real Housewives" franchise, while hardly alone, is notorious for manufacturing drama, manipulating story lines, and disseminating misinformation and lies for entertainment value.

51.     For years, past cast and crew members have acknowledged that many of the show's dramatic storylines are exaggerated, staged, or even outright fake.[7] Ultimately, the franchise operates with the premise that the drama needs to be there, and if it is not there organically, it needs to be manufactured or invented.

**II.     Todd Nepola Joins the RHOM Franchise.**

52.     RHOM was the seventh installment of the "Real Housewives" franchise and debuted on February 22, 2011. Its first season featured five women, including Alexia, who was married to Herman Echevarria at the time. RHOM followed the same format and structure as the other "Real Housewives" installments.

53.     Since his wife was going to be featured on a show that was purportedly going to

---

5 https://www.tmz.com/2013/03/04/real-housewives-of-beverly-hills-boycott-camille-grammer-adrienne-maloof-brandi-glanville/

6 https://www.pbs.org/newshour/show/history-of-reality-tv-and-impact-on-society-chronicled-in-new-book-cue-the-sun

7 https://screenrant.com/real-housewives-bravo-fake-storylines-according-cast-crew/

document her personal life, Mr. Nepola was naturally recruited to be part of the show as well. Out of his love and support for Alexia, he agreed to participate in the show.

54.    As part of this arrangement, Mr. Nepola signed an "Appearance Release, Voluntary Participation, and Arbitration Agreement" (the "Release") that detailed the terms of his participation in RHOM.

55.    Mr. Nepola signed the Release governing his participation in Season Four of RHOM, which aired between December 2021 and March 2022, and his participation in Season Five of RHOM, which aired between December 2022 and March 2023.

56.    Mr. Nepola quickly learned how the reality game was played behind the scenes, getting a firsthand look at how producers manipulated events and people to fit certain storylines. For example, Mr. Nepola was repeatedly encouraged to emulate a cast member from a different "Real Housewives" installment, with producers explicitly asking him to portray an aggressive yet comedic persona, something he fundamentally opposed.

### IV.    Bravo NBCU and PPP Film and Air Defamatory Statements About Mr. Nepola and Use His Name and Likeness Without His Consent in Seasons Six and Seven.

57.    Despite Mr. Nepola's decision not to participate in RHOM Seasons Six and Seven, and despite not signing a Release authorizing Bravo NBCU and PPP to use his name and likeness, the show, as the saying goes, must go on. In this case, which meant RHOM increased rather than decreased its focus on Alexia and Mr. Nepola, despite Mr. Nepola's choice to withdraw from RHOM.

58.    Not only did the Defendants produce content using Mr. Nepola's name and likeness without his permission and legal consent, but the Defendants also used Seasons Six and Seven as an opportunity to manufacture and highlight the unsubstantiated and false narrative that Mr.

12

Nepola was in financial distress. Specifically, it meant manipulating and, if necessary, manufacturing a storyline about Mr. Nepola's financial condition and stability (collectively, the "False Statements").

59.     In RHOM Season 6 Episode 2, which aired November 8, 2023, and is titled "Champagne Confessions," one of the Miami "Housewives," Adriana de Moura ("Adriana"), accuses Alexia of being with Mr. Nepola for his wealth, calling out the "love for his money" angle as they debate why Mr. Nepola didn't show up at Alexia's Nuevos Horizontes party.

60.     In that same episode, the episode ends with a "teaser" of a future episode in which Adriana says to another cast member, "A little bird told me that Todd and Alexia are having some trouble. I heard from Ana that Todd's business is not doing well, and they might have to break their lease and find a cheaper place."

61.     This was false at the time it was said and at the time it was aired, and Defendants knew this was false.

62.     Similarly, in RHOM Season 6 Episode 4, which aired November 29, 2023, and is titled "Slam Dunks and Friendship Funks," Adriana again brings up Mr. Nepola's alleged financial issues and claims: "Ana told me Todd's lending business is struggling because of interest rates. They're gonna have to move to a less expensive apartment."

63.     This was also false at the time it was said and at the time it was aired, and Defendants knew or should have known this was false.

64.     Additionally, in RHOM Season 6 Episode 6, which aired December 13, 2023, and is titled "Mother's Day Mayhem," Adriana makes these false claims again, saying, "Ana told me that Todd's business is struggling so badly that they had to break their lease — and they only had five days to move out of their apartment and find somewhere cheaper."

65.     This was also false at the time it was said and at the time it was aired, and Defendants knew this was false.

66.     Mr. Nepola had numerous conversations with producers, who were agents or representatives of Defendants, in which he explained to them that they were misrepresenting reality and publishing untruths about him. Mr. Nepola was told by these producers that they did not care.

67.     The new season, which is currently airing every week on Bravo, has included more of the same.

68.     In RHOM Season 7 Episode 1, which aired on June 11, 2025, and is titled "MIA Back in Action," the show again airs the footage of Adriana falsely claiming Mr. Nepola is struggling financially.

69.     While Mr. Nepola worked hard to combat the scandalous, malicious, and outright false allegations that Defendants aired in 2023, Defendants could not resist bringing these false statements back in 2025.

70.     The investigation of Defendants improper and unlawful conduct, outlined herein, confirms that the Defendants willfully, recklessly and /or with gross negligence published and republished, over and over again, false statements regarding Mr. Nepola's financial position in an effort to simply create a story line that would perpetuate interest in Alexia's character on the RHOM, drive viewership and improve the show's ratings.

71.     Based upon information and belief, Defendants knew or should have known, or, at least, were reckless or grossly negligent in failing to learn that the statements made during seasons six and seven regarding Mr. Nepola's financial position were false, fabricated and likely to damage Mr. Nepola's reputation.

72.     Mr. Nepola has maintained an impeccable reputation both personally and professionally throughout his life. He has never bounced a check, missed a payment, been evicted, faced foreclosure, had a vehicle repossessed, or experienced any financial hardship or proceeding that would question his creditworthiness or financial integrity.

73.     At no point has Mr. Nepola's credibility, reliability, or ethical standards ever been subject to legitimate dispute—until the false and damaging statements made by the Defendants.

74.     The defamatory story lines forged by the RHOM producers are completely devoid from reality. Mr. Nepola's net worth exceeds $100 million, and he is fully prepared to substantiate this to the Court. His financial standing has always been beyond reproach. In fact, during the filming of RHOM, Mr. Nepola purchased more than $115 million worth of real estate across 11 separate transactions, all of which were financed through traditional bank loans. Such financing would not have been possible without Mr. Nepola's exceptional credit, strong financial profile, and long-standing reputation in the industry.

75.     It is now clear that the producers of the RHOM, following Mr. Nepola's decision to reject and distance himself from the show after season five, used the subsequent seasons as an opportunity to retaliate against Mr. Nepola.

76.     The false implications, manufactured and/or disseminated by the Defendants, over and over again, suggesting Mr. Nepola was experiencing serious financial difficulties, has caused material harm to Mr. Nepola's reputation and credibility and have unjustly called into question his integrity and financial stability which he has built over his lifetime.

77.     Mr. Nepola has suffered significant emotional and psychological harm as a direct result of the defamatory narrative broadcast by Defendants and the subsequent viral amplification of that narrative across the internet. The format of *The Real Housewives* franchise—

15

particularly *The Real Housewives of Miami*—not only encourages audience engagement, but weaponizes it, turning cast members into targets of online ridicule, mockery, harassment, and abuse.

78.     Unlike fictional television, where characters are clearly understood to be acting in roles, the *Housewives* franchise is marketed and consumed as "reality," and the individuals featured are presented as authentic versions of themselves. This blurs the line between public persona and private identity, causing viewers to believe that what they see on screen is factual and representative of who the cast members truly are.

79.     This design choice is not incidental. Defendants intentionally structure the shows to provoke strong reactions from fans and rely heavily on the ensuing social media backlash, speculation, and online drama to promote their brand. Defamatory storylines are crafted, edited, and enhanced specifically because producers know they will trigger online frenzy—including TikTok videos, Instagram hate pages, Reddit threads, YouTube commentary channels, Twitter/X threads, and countless podcast discussions—all of which amplify the defamatory narrative beyond the original airing.

80.     Plaintiff has experienced the full weight of this machinery. The false portrayal of financial instability and irresponsibility has been discussed, mocked, and analyzed thousands of times online, generating a massive digital footprint of humiliation and reputational damage. These comments are often cruel, degrading, and deeply personal—ranging from accusations of fraud, to jokes about bankruptcy, to attacks on Plaintiff's integrity and character.

81.     This social media echo chamber operates day and night, creating a never-ending cycle of psychological trauma, public shaming, and emotional distress. Plaintiff has experienced: anxiety, depression, and emotional fatigue; insomnia and intrusive thoughts due to constant public

scrutiny; social withdrawal and fear of public appearances; and damage to professional relationships and business reputation.

82.     Defendants are fully aware of this consequence. Indeed, the toxic fan reaction is not a side effect—it is part of the business model. They encourage viewers to engage, comment, speculate, and shame, knowing full well that the mental and emotional toll on cast members is severe and, in some cases, life-altering.

83.     This is particularly true within the *Housewives* franchise, where cast members are portrayed as wealthy, glamorous, and socially elite. A storyline suggesting financial failure or instability not only damages the individual's personal reputation but strips them of their identity within the constructed universe of the show, making them the subject of derision and exclusion both on-screen and off.

84.     In Plaintiff's case, these portrayals were not only false, but entirely avoidable, and the resulting emotional harm has been extreme. Despite this, Defendants have shown no regard for the truth, the consequences, or Plaintiff's mental health, so long as the story continues to generate clicks, views, and social engagement.

85.     Mr. Nepola did not want to bring this lawsuit. He could have and should have filed suit in 2023 but chose, instead, to let it go and try to ignore the wildly false and deeply manipulated stories told on RHOM.

86.     In return, Mr. Nepola was exploited by the Defendants with no consideration for the truth or the reputational harm caused by their reckless conduct.

87.     Mr. Nepola wanted to be Alexia's husband, not her storyline. For too long and out of respect for his ex-wife, Mr. Nepola remained silent while Defendants painted a fictional version of him.  As the saying goes, enough is enough.

88.     Mr. Nepola Nepola's reputation was built on integrity, credibility, and a successful track record in the commercial real estate space.  The simple reality is that it takes decades to establish the confidence and trust of savvy real estate investors, and the Defendants have greatly tarnished Mr. Nepola's standing and reputation due to their callous and reckless disregard for the truth while producing and airing the RHOM.

89.      The Defendants, by filming and airing programing and content they knew or should have known was false in an attempt to manufacture sensational storylines for their reality soap opera, are now causing significant damage to Mr. Nepola's reputation and standing in the business world.

90.     Mr. Nepola retained the undersigned attorneys to protect his interests in this action and is obligated to pay the undersigned a reasonable fee for its services and representation.

## COUNT I
## DEFAMATION
(Against All Defendants)

91.     Mr. Nepola incorporates by reference the allegations contained in paragraphs 1 through 90 as if fully stated herein.

92.     Through the False Statements made on the RHOM series, produced by PPP, and aired by Bravo and NBCU, the Defendants created and published false, slanderous statements about Mr. Nepola.

93.     The Defendants' libelous episodes are defamation per se because they tend to subject Mr. Nepola to distrust, ridicule, contempt, and disgrace, and are injurious to Mr. Nepola's trade and professional reputation.

18

94.     The Defendants knew or should have known that the False Statements would cause severe damage to Mr. Nepola's reputation, business opportunities, community relationships, career, and business.

95.     The defamatory False Statements were aired by the Defendants with actual malice because they either knew of their falsity or made the statements, intentionally, maliciously, willfully, and with the intent to injure Mr. Nepola.

96.     Mr. Nepola has been harmed by the loss of economic value in the goodwill and the reputation he has built over many years.

97.     As a result of Defendants' publication of False Statements to third parties, Mr. Nepola has suffered millions of dollars in damages.

WHEREFORE, Plaintiff, Todd Nepola, respectfully requests that the Court enter judgment in Plaintiff's favor and against Defendants as follows:

A.      Awarding Plaintiff appropriate monetary relief, including Ten Million Dollars ($10,000,000) in compensatory damages, exclusive of interest and costs; and

B.      Awarding Plaintiff such other and further relief as allowable under law.

## COUNT II
## VIOLATION OF FLORIDA STATUTES, § 540.08(1)
(Against Bravo and NBCU)

98.     Mr. Nepola incorporates by reference the allegations contained in paragraphs 1 through 90 as if fully stated herein.

99.     Florida Statutes, § 540.08(1) provides: "No person shall publish, print, display or otherwise publicly use for purposes of trade or for any commercial or advertising purpose the name, portrait, photograph, or other likeness of any natural person without the express written or

4937-9035-6845, v. 1

oral consent to such use given by: (a) Such person; or (b) Any other person, firm or corporation authorized in writing by such person to license the commercial use of her or his name or likeness."

100.    By airing the controversial and unauthorized discussions about Mr. Nepola during Seasons Six and Seven without requiring that he  sign a Release for those specific seasons, Bravo and NBCU violated the above statute by publishing, printing, displaying or otherwise publicly using Mr. Nepola's name and/or likeness, for purposes of trade or for any commercial or advertising purpose, without Mr. Nepola's express written or oral consent.

101.    As a result of Defendants' publication and displaying Mr. Nepola's name and likeness without his consent, Mr. Nepola has suffered damages. The Defendants should be enjoined from continued violation of Florida Statutes, § 540.08(1), with respect to their production and dissemination of media which includes the unauthorized use of Mr. Nepola's name or likeness.

WHEREFORE, Plaintiff, Todd Nepola, respectfully requests that the Court enter judgment in Plaintiff's favor and against Defendants as follows:

A.    Awarding Plaintiff appropriate monetary relief, including One Million Dollars ($1,000,000) in compensatory damages, exclusive of interest and costs;

B.    Awarding Plaintiff a preliminary and permanent injunction enjoining Defendants from engaging further in the unauthorized use of Plaintiff's name or likeness for commercial gain; and

C.    Awarding Plaintiff such other and further relief as is allowable under law.

## Demand for Jury Trial

The Plaintiff requests trial by jury of all matters so triable.

Dated: <u>October 7, 2025</u>.

**KOPELOWITZ OSTROW**
**FERGUSON WEISELBERG GILBERT**
*Attorneys for Plaintiff*
One West Las Olas Blvd., Suite 500
Ft. Lauderdale, Florida 33301
Telephone No.: (954) 525-4100
Facsimile No.: (954) 525-4300

By:   */s/ Scott J. Weiselberg*
         SCOTT J. WEISELBERG
         Florida Bar No. 122701
         weiselberg@kolawyers.com
         BENJAMIN R. MUSCHEL
         Florida Bar No.: 119305
         muschel@kolawyers.com

21

## **VERIFICATION**

Under penalty of perjury, I declare that I have read the foregoing, and the facts alleged therein are true and correct to the best of my knowledge and belief.

**TODD NEPOLA**

By: _____

Date: October 6 2025

21